IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

Filed/Docketed
Oct 06, 2014

| | |
|---|---|
| IN RE:<br><br>**BRADLEY EVAN WHITE,**<br><br>Debtor. | Case No. 13-12131-M<br>Chapter 7 |
| **ROBERT J. HERMAN,**<br><br>Plaintiff,<br><br>v.<br><br>**BRADLEY EVAN WHITE,**<br><br>Defendant. | Adv. No. 13-01073-M |

## MEMORANDUM OPINION

Most businesses, like most marriages, begin with great expectations. Sadly, some businesses, and some marriages, fail. When that happens, expectations change. Instead of focusing on future benefits, people look to recover past investments. If there is a written business arrangement or a prenuptial agreement, the parties know what to expect. If not, they are left to their own devices or the matter is presented to a court to sort things out. One or both may go so far as to restructure the transaction as they wished it would have been had they known it was doomed to failure. This is a risky proposition at best.

This case involves two couples, a maternity store, and an ultrasound machine. The couples believed that expectant mothers would flock to a store where they could get pictures of their awaited bundle of joy. When things didn't go as planned, one couple (who, not coincidentally, put most if not all of the money into the business) wanted out and wanted their money back. The most valuable

asset in the store was the ultrasound machine. New documentation was drafted to the effect that the machine had been leased to the business. The business has failed, one couple has divorced, the machine was sold, and the proceeds of its sale are gone. What, then, are we to make of the debt that remains? The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052.

## Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).[1] Its reference to this Court is proper pursuant to 28 U.S.C. § 157(a). Issues of nondischargeability of debt are core proceedings under the terms of 28 U.S.C. § 157(b)(2)(I).

## Burden of Proof

The issue before the Court is whether a debt owed by the defendant to the plaintiff should be excepted from discharge under § 523(a)(6) of the Bankruptcy Code. Exceptions to discharge are to be narrowly construed in favor of the debtor so as to promote the "fresh start" policy of the Bankruptcy Code.[2] Under § 523, a creditor seeking to except its claim from discharge must prove the claim is nondischargeable by a preponderance of the evidence.[3]

## Findings of Fact

Robert J. Herman ("Herman") is an orthodontist in the Tulsa area. Herman had purchased or leased multiple vehicles from a local Jaguar dealership. Bradley Evan White ("White") was the manager at that dealership. In the course of buying automobiles, Herman came to know White. The

---

[1] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq*.

[2] *See Jones v. Jones (In re Jones),* 9 F.3d 878, 880 (10th Cir. 1993).

[3] *Id.* (*citing Grogan v. Garner,* 498 U.S. 279, 291 (1991)).

two became friendly and began to discuss potential business opportunities.

In 2008 or 2009, Herman and White decided to form a company named Oklahoma Premier Developments, LLC (the "LLC"). Herman's attorney, Ron Saffa ("Saffa") of the law firm Morrel, Saffa, Craige, assisted with the formation of the LLC.[4] Herman, White, and their respective wives each held a 25% ownership interest in the LLC. The LLC was formed to operate a retail store called "Baby Bump," which would sell clothing and accessories, provide massage and spa services, and provide nondiagnostic 4-D ultrasound services to expectant mothers. The original business plan called for Herman and his wife (the "Hermans") to contribute capital, while White and his wife (the "Whites") would undertake the day-to-day operation of the business. Herman would be responsible for financial management and accounting. Business decisions were to be made by consensus. A business credit card was obtained that named Herman as the primary account holder. A business bank account at Stillwater National Bank named each of the four owners as signatories.

As the retail store was being set up, the Hermans made cash contributions to the LLC to pay contractors, lease payments, and other start-up costs. A 4-D ultrasound machine was located. The parties inquired about financing the ultrasound machine from the vendor, but decided that the offered interest rate was prohibitive. Instead, on August 28, 2009, Herman purchased an ultrasound machine (the "Machine") for $75,000 using a personal credit card. The invoice for the Machine sheds no light on its ownership.[5] It states that Herman is to be billed for the Machine, and the Machine is to be shipped to the retail location of Baby Bump. Herman testified that he purchased the Machine for the LLC in order to allow the LLC to obtain the Machine and pay a lower rate of

---

[4] None of the documents that created the LLC were offered into evidence.

[5] *Plaintiff's Ex.* 4.

3

interest than offered by the vendor; however, no formal arrangement to make payments to Herman on the Machine was put in writing. The original terms of repayment, including but not limited to the interest rate to be charged, remain a mystery.[6]

Within months, the relationship between the parties had soured. In November 2009, the Hermans decided that they no longer wished to be part of the LLC and offered the Whites the opportunity to buy out their interest in the LLC. The Whites, which had both quit their previous jobs in order to devote their time to operating Baby Bump, wanted to maintain the business. The parties signed a withdrawal agreement that provided for the Whites to repay a portion of the capital that the Hermans had put into the LLC. The Whites each became 50% owners of the LLC. The business credit card in Herman's name was cancelled, and the Whites signed a separate promissory note to repay the Hermans a portion of the debt owed on the card.

After the Hermans made the decision to withdraw from and sell their interests in the LLC to the Whites, Saffa drafted and the parties signed a document titled "Equipment Lease" (the "Contract") that purported to lease the Machine from Herman to the LLC, with the Whites as guarantors of the payments.[7] Herman testified to his understanding that he was the owner of the

---

[6] Given that none of the details of this alleged interest rate or any terms of repayment were provided to the Court, Herman's testimony that he purchased the Machine using his personal credit card in order to allow the LLC to pay a lower rate of interest on the debt represented by the Machine is given very little weight. The Court finds that much of Herman's testimony regarding the acquisition of the Machine is based upon his current goals and expectations, rather than the intent of the parties at the time the LLC was formed and/or the Machine was acquired.

[7] *Plaintiff's Ex.* 2. Despite referring to the arrangement as a "lease" throughout the hearing, counsel for Herman acknowledged that Herman's interest should more correctly be referred to as a security interest in the Machine. He also acknowledged that a previous Court has found the Contract to be in the nature of a security agreement and not a true lease.

Machine, and that it was being leased to the LLC.  Herman believed that leasing the Machine to the LLC, so that Baby Bump could remain in business, was his best opportunity for being repaid by the Whites.[8]  The Contract, which is governed by Oklahoma law by its terms, states that the term of the "lease" runs from December 1, 2009, to January 15, 2013.[9]  The Contract states that the LLC will pay $74,657.16 over the term of the lease in 36 equal payments of $2,073.81, and that at the end of the lease term, the LLC will have the option to purchase the Machine for one dollar.  The Contract is not subject to termination by the LLC, and the risk of loss of the Machine is placed squarely on the LLC.

All of the documents related to the separation (the "Separation Documents") were drafted by Herman's counsel, Saffa.  None of the Separation Documents other than the Contract are in evidence.  Although the Contract identifies Saffa as Herman's counsel, White testified that he understood Saffa to be the LLC's counsel and assumed that Saffa was working on behalf of the LLC and not Herman personally.  White admitted signing the Contract.  He understood that payment for the Machine was included in the money that he and his wife owed to Herman.  He did not seem to understand that the money owed was on different terms, or of a different character, than the other debt to Herman.  White testified that he knew the Machine had been purchased by Herman using a personal credit card, but understood that was done for the convenience of Herman and to save money on interest, and did not understand that the Machine was to be treated differently than any

---

[8] The Machine was purchased on August 28, 2009, and ostensibly used by the LLC from and after that date.  However, the Contract (purporting to be a lease) was not executed until November 16, 2009.  The Court is left to ponder the legal basis upon which the LLC maintained dominion and control over the Machine from August 28, 2009, through November 16, 2009.

[9] *See Plaintiff's Ex.* 2 at 7 (Governing Law).

other piece of equipment or inventory related to the LLC. Despite his execution of the Contract, White did not understand or believe that Herman held a lien on the Machine.

After the Hermans were removed as owners of the LLC, the Whites continued to operate Baby Bump. White made various payments to Herman, some in cash. Herman acknowledged these payments, but emphatically denied that any payments were applied to amounts due under the Contract. Although claiming that the payments were not applied arbitrarily or at his sole discretion, Herman did not explain how payments were applied to amounts owed. No evidence regarding how much White ultimately paid Herman or how those payments were applied was presented by either party.

In late 2009 or early 2010, Baby Bump was floundering. The Machine had been in and out of service and needed costly repairs. White testified that in order to "keep the lights on," e.g., generate some income to save the business, he made the business decision to sell the Machine. White did not ask for or receive consent to sell the Machine from either Herman or White's then estranged wife, who at that time remained a 50% owner of the LLC. White did not believe he needed consent.

In January 2010, the LLC, through White, sold the Machine to KPI Ultrasound, Inc. ("KPI") for $43,000.[10] A receipt shows that those funds were transferred by wire from KPI to Account No. 0005120955, with a "Beneficiary Account Name" of Bradley White.[11] White claims that this was the LLC business bank account, and that his name must have been put on the account when he and

---

[10] *Plaintiff's Ex.* 1.

[11] *Plaintiff's Ex.* 3. The exhibit does not reveal the bank where the account was established.

his wife assumed full ownership of the LLC; Herman claims that it was a personal account belonging to White. Neither party presented evidence on this issue or the ultimate fate of the sales proceeds from the Machine. The Court finds, based upon White's statements that he sold the Machine "to keep the lights on" that proceeds from the sale of the Machine were used to maintain business operations. The inference is consistent with statements made to Herman by White during the course of negotiations to resolve their differences. In any event, the burden of proof in this case is on Herman to show that White misappropriated the proceeds of sale from the Machine to White's own personal benefit. Herman has failed to do so.

After the Machine was sold, the Baby Bump retail store remained open for over 6 months. White continued to make payments to Herman on the debt represented by the Separation Documents. In approximately April 2010, Herman made the decision to repossess the Machine. He was informed by the landlord for Baby Bump that the Machine was no longer located in the store. Herman asserts that when he confronted White regarding the whereabouts of the Machine, he was told that it was out for repair. White admits that he told Herman that it was "none of his business," but denies lying to Herman about the fact that he had sold it. In June or July 2010, Herman made calls to several repair shops and learned that White had sold the Machine to KPI in January of that year. Herman immediately filed the lawsuit against the LLC and White that led to the eventual closure of the Baby Bump store. On June 25, 2013, the District Court of Tulsa County awarded Herman a default judgment against White in the amount of $74,657.16. This is the debt Herman seeks to have excepted from discharge.

White testified that he always understood the Machine to be property of the LLC. As the owner of the LLC and the guarantor of all its debt to Herman, White felt he had the sole right and

responsibility to make decisions about the Machine. He did not believe or understand that he needed permission from either Herman or his wife to make decisions related to the business, including whether to sell the Machine in an effort to keep the business operating. White testified that Herman only seemed to be concerned about being repaid the business debt created from the separation of ownership of the LLC, and that Herman did not seem interested in the day-to-day operation of the store or any specific business decisions.

To the extent the "Conclusions of Law" contain any items that should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

## Conclusions of Law

*Herman's Interest in the Machine*

As we begin, it is important to establish the nature of Herman's interest in the Machine. Despite the denomination of the Contract as a lease, the Court finds that the transaction was not a true lease. Under Oklahoma law, "[a] transaction creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and . . . (4) the lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement."[12] Moreover, under Oklahoma law, "[w]hether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case."[13] The Court has no difficulty finding the Contract to be a secured transaction instead of a true lease. All risk of loss with respect to the Machine fell upon the LLC. The LLC had

---

[12] Okla. Stat. tit. 12A, § 1-203(b).

[13] *Id.*, § 1-203(a).

8

no right to terminate its obligations under the Contract. At the end of the "lease," the LLC had the right to purchase the Machine for the whopping sum of one dollar. The Court finds that under the Contract, Herman held a security interest in the Machine, but no ownership interest.[14]

*Nondischargeability under § 523(a)(6)*

Herman seeks to have White's guaranty of the LLC's obligations under the Contract declared nondischargeable under § 523(a)(6) of the Bankruptcy Code.[15] Section 523(a)(6) states:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.][16]

The sale of collateral without remitting the proceeds to the secured party constitutes conversion of collateral.[17] An act of conversion, if willful and malicious, falls within the scope of § 523(a)(6). But not every act of conversion renders an underlying debt nondischargeable.[18] As the United States

---

[14] "The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer under Section 2-401 of this title is limited in effect to a reservation of a 'security interest'." *Id.* § 1-201(35).

[15] In his Complaint, Herman included a claim under § 523(a)(4) against White on the basis of embezzlement or larceny. This claim was abandoned by Herman at trial. As the Court has determined that any interest held by Herman in the Machine is in the nature of a security interest, a claim for embezzlement or larceny has no merit. The LLC (or White) cannot steal something it owns.

[16] § 523(a)(6).

[17] *See, e.g., Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332 (1934) (cited with approval in *Kawaauhau v. Geiger*, 523 U.S. 57, 63–64 (1998)); *Mitsubishi Motors Credit of Am., Inc. v. Longley (In re Longley)*, 235 B.R. 651 (10th Cir. BAP 1999).

[18] *Davis*, 293 U.S. at 332; *Am. First Credit Union v. Gagle (In re Gagle)*, 230 B.R. 174, 181 (Bankr. D. Utah 1999) (The tort of conversion "may, under certain circumstances, constitute a willful and malicious injury.") (Conversion of property consists of "an intentional exercise of dominion or control over chattel which so seriously interferes with the right of another to control

Supreme Court has made clear:

> [A] willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice. There may be an honest but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one.[19]

The Bankruptcy Appellate Panel of the Tenth Circuit (the "BAP") has held that "[n]ondischargeability under 523(a)(6) requires proof of two elements—that the injury is both willful and malicious."[20] Analysis begins with the statement by the United States Supreme Court that "the word 'willful' in [§ 523](a)(6) modifies the word 'injury,' indicating that non-dischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury."[21] In the Tenth Circuit, in order for conduct to be willful under § 523(a)(6), "the debtor must 'desire . . .the consequences of his act or . . . believe the consequences are substantially certain to result from it.'"[22] The term "malicious" requires proof "that the debtor either intend the

---

it that the actor may justly be required to pay the other the full value of the chattel."(citing Restatement (Second) of Torts (1965) § 222A)).

[19] *Davis*, 293 U.S. at 332 (citations omitted). *See also In re Longley*, 235 B.R. at 655.

[20] *McCain Foods USA Inc. v. Shore (In re Shore)*, 317 B.R. 536, 542 (10th Cir. BAP 2004) (citing *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004)).

[21] *Kawaauhau v. Geiger*, 523 U.S. 57, 61–62 (1998) ("[T]he (a)(6) formulation triggers in the lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend 'the *consequences* of an act,' not simply 'the act itself.'") (citing Restatement (Second) of Torts § 8A, Comment *a* at 15 (1964)) (emphasis added by the Court). *See also In re Longley*, 235 B.R. at 657 ("This definition of willful is the same as that stated by the Tenth Circuit Court of Appeals in *Compos* [768 F.2d 1155 (10th Cir. 1985)], a much narrower definition than that enunciated in *Posta* [866 F.2d 364 (10th Cir. 1989)]. This narrow reading of 'willful' is akin to the standard of deliberate injury necessary for an intentional tort.").

[22] *In re Moore*, 357 F.3d at 1129 (quoting *In re Longley*, 235 B.R. at 657).

resulting injury or intentionally take action that is substantially certain to cause the injury."[23] The test for maliciousness is a subjective one: "the court must determine what the debtor knew or intended with respect to the consequences of his actions."[24]

In *Mitsubishi Motors Credit of America, Inc. v. Longley (In re Longley)*,[25] the BAP found that the standard for "willful" under § 523(a)(6) "appears to be the same for conversion as for any other injury; to be willful, the debtor must intend that conversion of the collateral injure the creditor or the creditor's lien interest."[26] Following earlier Tenth Circuit law, the court found that

> Intent may be established by either direct or indirect evidence. Willful injury may be established by direct evidence of specific intent to harm a creditor or the creditor's property. Willful injury may also be established indirectly by evidence of both the debtor's knowledge of the creditor's lien rights and the debtor's knowledge that the conduct will cause particularized injury.[27]

The Court will apply these principles to the present facts.

The failure of White to remit the proceeds to Herman upon the sale of the Machine constitutes conversion of Herman's collateral.[28] This conversion qualifies as an injury to Herman's property sufficient to bring it under § 523(a)(6).[29] The question is whether that injury was willful and

---

[23] *Id.*

[24] *In re Shore*, 317 B.R. at 542 (citing *In re Moore*, 357 F.3d at 1129).

[25] 235 B.R. 651 (10th Cir. BAP 1999).

[26] *Id.* at 657.

[27] *Id.*

[28] *See, e.g., Davis*, 293 U.S. at 328; *In re Longley*, 235 B.R. at 651.

[29] *Cody Farms, Inc. v. Deerman (In re Deerman)*, 482 B.R. 344, 370 (Bankr. D.N.M. 2012) ("[A] threshold requirement to a determination of non-dischargeability under 11 U.S.C. § 523(a)(6) premised on conversion is whether the plaintiff had a property interest in the converted property.").

11

malicious.

In order to find willfulness, the Court must determine that White knew that the sale of the Machine would cause injury to Herman's interests. White testified repeatedly that he always considered the Machine to be the property of the LLC. He knew that Herman had purchased the Machine using a personal credit card instead of the business credit card. But White understood this to be for the convenience of Herman; he did not appreciate that such an arrangement could affect the ownership of the Machine or create a lien interest in favor of Herman. Even after signing the Separation Documents, including the Contract, White's understanding of the ownership of the Machine did not change. White understood that Saffa had "papered up" the deal, but he did not understand that to include the placing of a lien on the Machine. Although this Court might suggest that White *should have* understood that Herman held a secured interest in the Machine, the test for willfulness is not an objective one. The Court finds that the clumsy nature of the wording of the Contract, the fact that the transaction was conducted by the same attorneys that had been responsible for forming the LLC, and that the drafting of all of the Separation Documents, including the Contract, was done <u>months after the parties formed the LLC, purchased the Machine, and commenced business operations</u>, all contributed to White's (mis)understanding of the duties the LLC owed to Herman with respect to the Machine.[30] The Court finds White credible when he states that he firmly understood that the Machine was the property of the LLC, and that it was treated like any other asset, inventory, or equipment belonging to the LLC, i.e., that he did not need anyone's permission to dispose of it.

---

[30] It is important to remember that the Court has <u>no</u> documentary evidence before it regarding the creation of the LLC or the obligations between the LLC and Herman with respect to the Machine at the time of its purchase. In other words, when it comes to the Machine, we have no idea as to the original deal between the parties. All we have is documentation created after the fact, by counsel for one aggrieved party, drafted to protect that party's interests.

Although White intentionally sold the Machine—and may have done so with a reckless disregard for Herman's interest—the Court finds that White did not knowingly intend to injure an interest held by Herman when he did so.[31] Therefore the Court cannot find that White's action was willful.

Even if White's actions in selling the Machine were willful, the Court cannot find that Herman has met his burden of proof to show that the sale of the Machine was malicious. White testified that he made the decision to sell the Machine because it was in need of frequent repairs and felt that he could make better use of the capital to keep the retail store in operation. Moreover, the only evidence before the Court is that the proceeds of sale of the Machine were plowed back into the business. For whatever reason, Herman chose at trial not to ask White one simple question: "what happened to the money from the Machine?" Instead, Herman hangs his case on a wire transfer showing the proceeds of the Machine going to an account held in White's name.[32] White testified that this was the LLC's business account; Herman presented no evidence to the contrary. Herman presented no evidence that White used the proceeds for White's personal benefit. On the record before it, the Court finds that White sold the Machine in order to generate funds to "keep the lights on" at Baby Bump and continue making payments on the debt owed to Herman. While White's actions may have been misguided, the Court cannot find that they were malicious.

## Conclusion

---

[31] The Court finds this case analogous to the facts in *In re Longley*, 235 B.R. 651 (10th Cir. BAP 1999). In that case, the panel found that in the absence of proof that the debtor "was aware of or considered of [sic] the lien or its terms at the time he transferred the vehicle" the court was unable to conclude that the debtor intended to harm the creditor or its lien rights when he transferred the vehicle to a third party.

[32] Herman also argues that White's failure to consult his wife, the other 50% owner of the LLC, contributed to his injury. The Court cannot find that White's failure to consult his wife resulted in any cognizable injury to Herman.

The Court finds that, although Herman suffered a technical conversion of property subject to a secured interest, he has not met his burden to show that White's actions were willful and malicious. The evidence shows that White sold the Machine in order to keep Baby Bump in operation and to pay business expenses and debts. The evidence does not show that White intended to injure Herman's interest in the process. The Court concludes that White's debt to Herman is dischargeable, and therefore judgment should be entered in favor of White on all claims brought against him.

A separate judgment consistent with this Memorandum Opinion is entered concurrently herewith.

Dated this 6th day of October, 2014.

TERRENCE L. MICHAEL, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

6798.6